UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAUL HARVEY and LELA LAPLANTE, as representatives of a class of similarly situated persons, and on behalf of the BED BATH & BEYOND, INC. 401(K) SAVINGS PLAN,<br><br>Plaintiffs,<br><br>v.<br><br>BED BATH & BEYOND, INC. 401(K) SAVINGS PLAN COMMITTEE and LAURA CROSSEN,<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**CLASS ACTION** |

**NATURE OF THE ACTION**

1. Plaintiffs Paul Harvey and Lela LaPlante (Plaintiffs"), as representatives of the Class described herein, and on behalf of the Bed Bath & Beyond, Inc. 401(k) Savings Plan (the "Plan"), bring this action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against Defendants Bed Bath & Beyond, Inc. 401(k) Savings Plan Committee (the "Committee") and Laura Crossen ("Crossen") (together, "Defendants"), fiduciaries of the Plan. Defendants failed to monitor the prudence of the Plan's investment in the MassMutual Guaranteed Interest Account (GIA), certified false and misleading statements concerning the risk of loss to Plan participants invested in the GIA, and failed to take action to avoid the multi-million dollar losses that followed. Plaintiffs bring this action pursuant to 29 U.S.C. §§ 1104 & 1132(a)(2)-(3) to recover losses to the Plan and obtain other appropriate relief.

## JURISDICTION AND VENUE

2. Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which entitles participants in an employee benefit plan to pursue a civil action on behalf of a plan to remedy violations of ERISA and to obtain monetary and appropriate equitable relief.

3. This case presents a federal question under ERISA and, therefore, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

4. Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because the Plan was administered at the Plan sponsor's headquarters in this District and Defendants breached their fiduciary duties in this district.

## PARTIES

### DEFENDANTS

5. Defendant Committee was the fiduciary designated by Bed Bath & Beyond, Inc. ("BBB"), the sponsor of the Plan, to select and monitor Plan investments. The members of Defendant Committee were high-ranking employees of BBB. Defendant Committee was responsible for selecting the Plan's designated investment alternatives and monitoring those investments, and in that capacity acted as the fiduciary of the Plan within the meaning of 29 U.S.C. § 1002(21)(A)(i) because Defendant Committee exercised control regarding the management and disposition of Plan assets.

6. Defendant Crossen was BBB's Chief Accounting Officer and later its Chief Financial Officer. She exercised duties as the functional administrator of Plan. Her duties included certifying annual reports regarding the Plan's financial condition and investments that were filed with the Department of Labor and available to Participants. Defendant Crossen acted as a fiduciary

of the Plan within the meaning of 29 U.S.C. § 1002(21)(A)(iii) because she exercised discretionary responsibility in the administration of the Plan.

## PLAINTIFFS

7. Plaintiff Paul Harvey was a longtime BBB employee who participated in the Plan. Around 50% of his Plan account was invested in the GIA. In August 2023, his GIA balance suffered around a 10% loss. Plaintiff Harvey's distribution from the Plan would be higher if not for Defendants' failures to monitor Plan investments, report accurate information, and take action to avoid losses to the Plan.

8. Plaintiff Lela LaPlante was a BBB employee who participated in the Plan. A portion of her Plan account was invested in the GIA. In August 2023, her GIA balance suffered around a 10% loss. Plaintiff LaPlante's distribution from the Plan would be higher if not for Defendants' failures to monitor Plan investments, report accurate information, and take action to avoid losses to the Plan.

## THE PLAN

9. The Plan was a defined contribution retirement plan sponsored by BBB. The purpose of the Plan was to provide retirement benefits to BBB employees by allowing them to defer wages pre-tax and invest in an array of investment options selected and monitored by the Committee.

10. BBB terminated the Plan effective August 1, 2023. All participant balances will be distributed from the Plan by October 16, 2023.

11. The Plan was intended to qualify as a participant-directed plan under 29 U.S.C. § 1104(c), commonly known as a "404(c) plan". Qualification for 404(c) plan status requires the plan to offer a minimum of three investment options with materially different risk and return

characteristics, and which in aggregate permit the participant to achieve risk and return characteristics at any point along the risk-reward spectrum typically available for retirement plan participants. 29 C.F.R. § 2550.404c-1(b)(3)(i)(B).

12. It is broadly understood that in order to provide a full spectrum of potential portfolios along the risk-return spectrum to participants, a plan must offer at least one capital preservation option that fully protects participants from any loss of principal, while providing current income, so long as that income can be provided without risking the participant's principal.

13. Participants who invest in a plan's fixed investment option are seeking protection of principal. Given this expectation and the investment objectives of those investing in a plan's capital preservation option, a prudent fiduciary selecting and monitoring this option in a plan's investment lineup will avoid retained an investment option that could pose a risk of losses.

### DEFENDANT COMMITTEE'S FAILURE TO MONITOR THE GIA OR TAKE ACTION TO PREVENT LARGE LOSSES TO THE PLAN

*The GIA and the MassMutual Contract*

14. The GIA was the Plan's investment option intended to preserve Plan participants' principal balances and provide a fixed rate of return.

15. The GIA was governed by a group annuity contract between the Plan and Massachusetts Mutual Life Insurance Company (the "MassMutual Contract").

16. During the life the MassMutual Contract, Plan participants were able to move their account balances between the GIA and other Plan investment options at "contract value." The contract value preserved the principal balance of Plan assets invested in the GIA, as well as all interest credited to the participants' accounts under the contract terms.

17. The MassMutual Contract could be terminated by the Plan with notice. The MassMutual Contract also would automatically terminate upon the occurrence of specified events, including BBB filing for bankruptcy.

18. Upon termination, the contract value was subject to an adjustment based on the market value of the underlying investments purchased by MassMutual using the assets in the GIA. If the market value of the underlying investments dropped, MassMutual had the right to make up for these losses out of participant accounts upon termination of the contract. And because the GIA's underlying investments were almost entirely longer-term fixed income securities, the most likely cause of such a decline in market value would be an increase in interest rates, which is generally associated with a drop in the price of the type of securities that backed the GIA.

*Defendant Committee's Fiduciary Duties*

19. Under ERISA, the plan fiduciary responsible for selecting investments has an ongoing duty to monitor the investments to ensure that they remain prudent, and to remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

*Defendant Committee's Failure to Protect the Plan*

20. BBB filed for bankruptcy on April 23, 2023.

21. BBB's bankruptcy triggered termination of the MassMutual Contract and a market value adjustment to participant account balances in the Plan.

22. The market value adjustment was substantial and negative, wiping out around 10% of the value of participants' principal preservation accounts, totaling more than $5 million.

23. The high risk of a substantial, negative market value adjustment to participant account balances caused by a BBB bankruptcy was known or should have been known to Defendant Committee in advance and could have been avoided by exercising prudence and care.

5

24. BBB determined in 2019 that its business model was not viable after seven straight quarters of declining sales and its first annual loss in 2018. The company then launched a "transformation" campaign in an attempt to reinvent itself with private label brands and online sales—a dramatic shift from the company's decades-long commitment to name brands and brick and mortar sales. The company's financial situation got much worse during this attempted turnaround, and BBB posted an annual loss in 2019 that was more than four times larger than its loss in 2018. The company posted losses again in 2020 and 2021.

25. Defendant Committee was required to monitor the risk of loss to the Plan if BBB's reinvention campaign failed and the company declared bankruptcy. This did not require prescience regarding the ultimate fate of BBB's effort to reinvent itself after years of decline; rather, it required a prudent process for investigating risks and alternatives for the Plan. A prudent fiduciary would have (1) identified BBB's escalating risk of bankruptcy after 2018 and the prospect of a severe downward market value adjustment to GIA account balances, (2) investigated whether the Plan could terminate the MassMutual Contract favorably in the near term without a severe downward market value adjustment, and (3) investigated alternatives to the MassMutual Contract for offering Plan participants a principal preservation option that would protect their balances in the event of a future bankruptcy filing by BBB.

26. Had Defendant Committee undertaken this prudent process, it would have terminated the MassMutual Contract by notice and avoided the risk of Plan losses that could result from BBB's bankruptcy and a decrease in value of the GIA's underlying portfolio. While the company's high risk of bankruptcy was well known,[1] the exact timing of a potential bankruptcy

---

[1] *See, e.g.*, Angie Basiouny, What Went Wrong at Bed Bath & Beyond, KNOWLEDGE AT WHARTON, May 2, 2023, available at https://knowledge.wharton.upenn.edu/article/what-went-wrong-at-bed-bath-beyond/ ("Wharton marketing professor Barbara Kahn heard the death knell

could not be known by the Committee. The choice was between exiting the MassMutual contract at a time when the Committee knew that the market value adjustment would not have a significant adverse impact on participants' principal preservation accounts, or gambling that market conditions would be favorable on the unknown future date that BBB might declare bankruptcy.[2] During 2020 and 2021, there was ample opportunity for the Committee to secure a favorable exit from the MassMutual Contract and GIA and replace the GIA with a principal preservation alternative that would not be subject to the same risks if BBB declared bankruptcy. The Committee breached its fiduciary duty of prudence by failing to engage in a prudent monitoring process and failing to take action.

27. Indeed, there were several other types of capital preservation options that would not have imposed a risk of a significant market value adjustment. Stable value funds, otherwise known as synthetic GICs (guaranteed interest contracts), use insurance to protect against losses in the underlying fixed income securities. Certain stable value funds offer more favorable exit terms in the event of a forced liquidation, and such funds can be constructed with shorter term securities than the GIA to substantially mitigate the risk of any market value losses caused by an increase in interest rates. Money market funds also would have provided the principal protection the Plan required for participants invested in the GIA without imposing risk of a market value adjustment.

---

for Bed Bath & Beyond long before the company announced last month that it was going out of business.").

[2] Bond prices are predictive, meaning once it is known that interest rates are likely to rise in the future, bond prices tend to drop right away, and those drops can be significant and sustained. The Committee could have avoided the risk of such a sudden and sustained drop in the market value of the securities backing the GIA by exiting the MassMutual contract at a time when interest rates were expected to remain low.

28. The Plan and its participants suffered substantial losses due to the Committee's imprudence. Had the Committee exited the MassMutual Contract without a material negative market value adjustment in 2020 or 2021, distributions to Plan participants would be higher. Any small difference between the interest credited under the MassMutual contract and interest that would have been credited by a prudent alternative principal preservation option would not have come close to making cup for the approximate 10% loss that Plan participants suffered due to the market value adjustment in 2023.

29. Making such a change would not have required Defendants to commit any kind of insider trading. Though they would be acting to avoid the risks associated with corporate bankruptcy, they would merely be trading in fixed income securities of unaffiliated entities. So in this setting, acting upon information regarding the company's financial situation was not only legal, and was not only something Defendants *should* have been doing, it was something that Defendants (falsely) claimed they *were* doing, as described below.

## DEFENDANT CROSSEN'S CERTIFICATION OF FALSE STATEMENTS

30. Defendant Crossen was the financial officer responsible for reviewing the Plan's annual financials statements and certifying that the statements contained therein were correct.

31. At the same time, Defendant Crossen was BBB's Chief Accounting Officer and, as of September 2022, its Chief Financial Officer. She therefore knew that BBB was at heightened risk of bankruptcy after 2019, and that the company's turnaround strategy was a conscious gamble by the company to stave off the high probability of bankruptcy.

32. Notwithstanding, in October 2020, October 2021, and October 2022, Defendant Crossen certified statements contained in the Plan's annual reports declaring the company did not

believe any event that would subject the GIA to a market value adjustment—including "bankruptcy of the plan sponsor"—was "probable of occurring."

33. Defendant Crossen had a fiduciary duty of loyalty and prudence to the Plan to investigate and accurately report the company's perceived bankruptcy risk in relation to the GIA in the Plan's annual reports. While concealing the company's perceived risk benefited the company as it engaged in its last-ditch efforts to avoid bankruptcy, concealing the probability of bankruptcy in the Plan's annual reports had adverse consequences for the Plan and its participants. Had Defendant Crossen required an accurate statement regarding the company's bankruptcy risk and the risk of a market value adjustment, Defendant Committee would not have been able to bury its head in the sand and would have been compelled to investigate alternatives. Defendant Crossen's breach of her duties therefore enabled Defendant Committee's breach.

**PLAINTIFFS' LACK OF KNOWLEDGE OF DEFENDANTS' VIOLATIONS OF ERISA**

34. Plaintiffs did not have actual knowledge of all material facts necessary to understand the Defendants breached their fiduciary duties under ERISA until shortly before filing this action. Among other things, Plaintiffs did not have actual knowledge of the terms of the GIA and MassMutual Contract, the availability of prudent alternative principal preservation options that would have protected against or mitigated loss in the event of BBB's bankruptcy, the market conditions that would have negated or minimized any adverse impact of an earlier termination of the MassMutual Contract by notice, or the extent of BBB's financial losses and the probability of bankruptcy that existed years in advance. Plaintiffs also did not have actual knowledge of Defendant Crossen's certifications or the Plan's annual reports, or the process engaged in by Defendants in relation to their fiduciary duties to the Plan. Plaintiffs' allegations are based on their

9

experience as Plan participants, investigations of counsel, and reasonable inferences drawn from the facts available before discovery.

## **PLAN-WIDE RELIEF**

35. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek recovery on behalf of the Plan pursuant to this statutory provision (in addition to relief under 29 U.S.C. § 1132(a)(3)).

36. Plaintiffs seek recovery for losses to the Plan due to Defendants' fiduciary breaches and equitable relief on behalf of the Plan as a whole.

37. Plaintiffs are adequate to bring this derivative action on behalf of the Plan, and their interests are aligned with the Plan's other participants and beneficiaries. Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede their ability to pursue this action. Plaintiffs have retained counsel experienced in ERISA litigation and intend to pursue this action vigorously on behalf of the Plan.

## **CLASS ACTION ALLEGATIONS**

38. Plaintiffs additionally and alternatively seek certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

39. Plaintiffs assert their claims on behalf of the Class of participants and beneficiaries of the Plan defined as follows:

> All participants and beneficiaries of the Plan whose GIA account balance was reduced by the market value adjustment after BBB filed for bankruptcy.

40. <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The Plan had thousands of participants and the GIA was a popular investment option.

41. <u>Typicality</u>: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs were Plan participants and suffered losses due to Defendants' violations of ERISA. Defendants treated Plaintiffs consistently with other Class members with respect to the Plan's GIA investment.

42. <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

43. <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

    a. Whether Defendants were fiduciaries with respect to the Plan;

    b. Whether Defendants prudently monitored the Plan's GIA investment and considered actions to avoid large losses to Plan participants;

    c. Whether statements certified by Defendant Crossen in the Plan's annual reports regarding the GIA were false;

    d. The proper form of equitable relief; and

    e. The proper measure of monetary relief.

44. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying

adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

45. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as allocation of wrongfully retained funds to participants, would be dispositive of the interests of all participants.

46. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

47. Plaintiffs and undersigned counsel will provide notice to the Class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

## CAUSES OF ACTION

### COUNT I
**Breach of the Fiduciary Duty of Prudence with Respect to Monitoring Plan Investments**
**Against Defendant Committee**
**29 U.S.C. § 1104(a)(1)**

48. Plaintiffs incorporate by reference Paragraph 1–29 as though fully stated herein.

49. Defendant Committee failed to satisfy its duty of prudence pursuant to 29 U.S.C. § 1104(a)(1) with respect to monitoring the Plan's investment in the GIA and timely removing the GIA from the Plan, resulting in losses to the Plan and the individual accounts of Plaintiffs.

50. Plaintiffs, the Plan, and the Class are entitled to monetary and equitable relief pursuant to 29 § U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3) as a result of this violation.

### COUNT II
**Co-Fiduciary Liability with Respect to Certification of False Statements**
**Against Defendant Crossen**
**29 U.S.C. § 1104(a)(1)**
**29 U.S.C. § 1105(a)(2)**

54. Plaintiffs incorporate by reference Paragraphs 1–29 as though fully stated herein.

55. As the administrator of the Plan responsible for reviewing and certifying the accuracy of statements contained in the Plan's annual reports, Defendant Crossen failed to conduct her review and certification prudently and loyally, in violation of 29 U.S.C. § 1104(a)(1).

56. By failing to conduct a prudent and loyal review and certification, Defendant Crossen enabled Defendant Committee's violation of its fiduciary duty to monitor and remove imprudent investments from the Plan (*see* Count I). Defendant Crossen is therefore liable as a co-fiduciary for the losses caused by Defendant Committee's violation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, and for the following relief:

A. Certify Plaintiffs' authority to seek plan-wide relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2);

B. Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify Plaintiffs as class representatives, and their counsel as class counsel;

C. Declare that Defendants violated ERISA, 29 U.S.C. §§ 1104(a)(1);

D. Order Defendants to make good to the Plan all losses resulting from their violations of ERISA;

E. Determine a fair allocation of recovered sums to Plan participants;

F. Appoint an independent administrator of the Plan to administer the distribution of recovered sums to Plan participants;

G. Order that Defendants provide other appropriate equitable relief to the Plan and the Class;

H. Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

I. Award prejudgment and post-judgment interest; and

J. Award such other and further relief as the Court deems just and equitable.

Dated: September 14, 2023

Respectfully submitted,

*/s/ Andrew R. Frisch*
Andrew R. Frisch, NJ Bar No. 038452000
**MORGAN & MORGAN, P.A.**
8151 Peters Road, Suite 4000
Plantation, Florida 33324
Telephone: (954) 967-5377
Facsimile: (954) 327-3013
afrisch@forthepeople.com

Marc R. Edelman, FL Bar No. 0096342*
**MORGAN & MORGAN, P.A.**
201 N. Franklin Street, Suite 700
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 257-0572
medelman@forthepeople.com

Carl F. Engstrom, MN Bar No. 0396298*
**ENGSTROM LEE LLC**
729 N. Washington Ave, Suite 600
Minneapolis, MN 55401
Telephone: (612) 305-8349
Facsimile: (612) 677-3050
cengstrom@engstromlee.com

Brandon J. Hill, FL Bar No. 0037061*
**WENZEL FENTON CABASSA, P.A.**
1110 N. Florida Avenue, Suite 300
Tampa, Florida 33602
Telephone: (813) 224-0431
Facsimile: (813) 229-8712
bhill@wfclaw.com

*pro hac vice* forthcoming

**COUNSEL FOR PLAINTIFFS**